**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PENNZOIL-QUAKER STATE CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-2025 |
| | § | |
| AMERICAN INTERNATIONAL | § | |
| SPECIALTY LINES INSURANCE CO., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Pennzoil-Quaker State Company sued its insurer, American International Specialty Lines Insurance ("AISLIC"), alleging breach of contract and a violation of Chapter 542 of the Texas Insurance Code. Pennzoil obtained a pollution legal liability policy from AISLIC for its Shreveport, Louisiana refinery. From January 2001 to May 2001, Pennzoil was sued in five lawsuits filed in the Louisiana state courts by residents who live near the refinery. In the suits, the plaintiffs alleged that Pennzoil released various pollutants into the air and groundwater surrounding the refinery, causing physical injury, mental distress, and property damage. The lawsuits were administratively consolidated in June 2003. Pennzoil seeks a defense and indemnity from AISLIC for these lawsuits.

AISLIC disputes coverage as to one of the suits on the basis of late notice. AISLIC agrees that the allegations of the other four underlying suits are within the policy. The issue is whether the underlying suits involve "related Pollution Conditions," requiring Pennzoil to pay a single deductible, or several unrelated Pollution Conditions, each requiring a deductible. AISLIC has refused to pay any of the defense costs Pennzoil has incurred to date on the basis that the underlying actions involve four unrelated Pollution Conditions. Pennzoil asserts that the pollution releases

alleged in the underlying lawsuits are related and that only one deductible is due under the policy. Pennzoil has moved for partial summary judgment that AISLIC has breached its contract by failing to pay the defense costs, which exceed the single deductible, and a declaratory judgment that Pennzoil has satisfied its deductible obligation under the policy.  (Docket Entry No. 20).  AISLIC has responded, arguing that the evidence in the record raises a fact issue as to whether the Pollution Conditions are "related."  (Docket Entry No. 32).

Based on careful review of the pleadings, the motion and response, the parties' submissions, and the applicable law, this court denies Pennzoil's motion for summary judgment.  The reasons are explained below.

## I.    Background

Pennzoil is the named insured under a claims-made Pollution Legal Liability Select Policy No. PLS 2679236 (the Policy), issued by AISLIC for the period October 1, 1999 through October 1, 2002.  (Docket Entry No. 1, at 5).  The Policy describes Coverages A, B, C, D, E, F, G, H, and I, for a variety of pollution-related claims.  (Docket Entry No. 20, Ex. 3-A).  Under Coverage F, AISLIC agreed to "pay Loss on behalf of the Insured that the Insured becomes legally obligated to pay as a result of Claims first made against the Insured and reported to the Company in writing during the Policy Period . . . for Bodily Injury or Property Damage beyond the boundaries of the Insured Property that result from Pollution Conditions, on or under the Insured Property which have migrated beyond the boundaries of the Insured Property."  (*Id.*).  The Policy states that AISLIC "shall have the right and duty to defend any Claims covered under Coverages A through I . . . ." (*Id.*).  The limits of liability for Coverages D, E, and F are $25 million for "Each Incident" and $25 million in the aggregate, subject to a $2 million "Each Incident" Deductible.  The Policy requires

2

AISLIC to pay "covered Clean-Up Costs, or Loss . . .  in excess of the Deductible amount stated in Item 3 for that particular coverage, up to . . . the applicable 'Each Incident' limit of coverage.  The Deductible amount applies to all Clean-Up Costs, or Loss arising from the *same, related or continuous Pollution Conditions*." (*Id.*) (emphasis added).  Item 3 of the Declarations states that the Deductible amount for Coverages D, E, and F is $2,000,000.00.

The Policy defines "Pollution Conditions" as the "discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical wastes and waste materials into or upon land, or any structure on land, the atmosphere, or any watercourse or body of water, including groundwater . . . ." (*Id.*).  The Policy states that "Loss" includes "monetary awards or settlements of punitive and compensatory damages for Bodily Injury or Property Damage" as well as "Clean-Up Costs."  The Policy also states that defense costs are included in Loss and "within the Deductible amount." (*Id.*).

Between January and May 2001, Pennzoil was sued in five separate actions.  Each lawsuit alleged personal injury and property damage suffered by residents of neighborhoods near the refinery from releases of pollutants during the Policy period.  These lawsuits were consolidated in June 2003.  A brief description of the pleadings in the underlying lawsuits is set out below.

- *Velma White, et al. v. Pennzoil-Quaker State Company*, No. 455,657-A, in the First Judicial District Court for the Parish of Caddo, Louisiana, January 17, 2001. (Docket Entry No. 1, at 6).  This class-action suit was brought on behalf of individuals living near the refinery who allegedly sustained injuries and damage, including "anguish," "physical mental and emotional damage," and "property damage" as a result of alleged releases of "benzene, mixed xylenes, nitrogen oxides and possibly other

dangerous substances" from Pennzoil's Shreveport refinery during a January 18, 2000 fire and explosion.  (*Id.*).  The plaintiffs alleged that the fire and explosion were caused by Pennzoil's failure to adequately maintain, inspect, and prevent the chloride corrosion of a heat exchange unit in the Naptha Unifiner Unit, as well as failures to properly train employees.  (*Id.*).  In a supplemental and amending petition, the plaintiffs alleged injury and damage from exposure to pollutants released on November 4, 2001.

- *Lawrence C. Justice, et al., v. Pennzoil-Quaker State Company et al.*, No. 455,655-A, in the First Judicial District Court for the Parish of Caddo, Louisiana, January 19, 2001.  The plaintiffs, more than 240 residents of Caddo Parish, alleged that "numerous and regular unpermitted releases of harmful and/or toxic air pollutants into the community" caused physical and mental injury as well as property damage.  The plaintiffs also alleged "alarming concentrations of hazardous and/or toxic substances" in subsurface waters.  The alleged pollutants released included benzene, mixed xylenes, benzoanthracene, and benzopyrene, and allegedly caused physical injury, mental distress, and property damage. (*Id.* at 7).  One of the releases was alleged to be from the January 18, 2000 fire and explosion.

- *Luberta J. Daughtry, et al., v. Pennzoil-Quaker State Company*, No. 455,648-B, in the First Judicial District Court for the Parish of Caddo, Louisiana, January 22, 2001.  (*Id.*).  The plaintiffs in the *Daughtry* case alleged that Pennzoil "released hazardous chemicals into the atmosphere and environment, and the release of these hazardous chemicals has caused plaintiffs, to suffer a variety of health related problems

4

including, but not limited to, renal problems and a whole host of skin ailments, cancers, and other sicknesses" as well as "anguish," "emotional damage," and "damage to . . . property, both moveable and immovable."  (*Id.*, at 7–8).  These releases were also alleged to have been the result of Pennzoil's failure to adequately maintain or inspect equipment or train employees.  The suit was pleaded as a class action.  The plaintiffs in this suit did not separately allege damages relating to the January 18, 2000 fire and explosion in the Naptha Unifiner Unit.  The suit and supplemental suit alleged continuous releases of pollutants into the air and subsurface water, causing physical injury, mental anguish, and property damage.

- *Denise Worsham, et al. v. Pennzoil-Quaker State Company*, No. 456,574-A, in the First Judicial District Court for the Parish of Caddo, Louisiana, March 19, 2001. (*Id.*, at 8).  The plaintiffs in this class action suit alleged continuous releases of hazardous chemicals into the air and groundwater, causing physical injury, mental injury, and property damage.  There is no allegation relating to the January 18, 2000 fire or explosion.  The suit alleged that Pennzoil "allowed dangerous chemicals from its facility to permeate the surrounding area, causing fear, fright, inconvenience, property damage, and personal injuries to petitioners and other persons in the vicinity of defendant's facility."  (*Id.*).  These releases were alleged to have been the result of Pennzoil's failure to inspect, maintain and repair the refinery and its equipment.

- *Mary Shepard, et al. v. Pennzoil-Quaker State Company et al.*, No. 458,379-C, in the First Judicial District Court for the Parish of Caddo, Louisiana, May 10, 2001. (*Id.*,

at 8–9).  The plaintiffs in the *Shepard* case alleged that releases of "benzene, mixed xylenes," "benzoanthracene, benzopyrene, bis(2-Ethylhexyl)phlthalate, benzo(b)floranthene [and] benzo(k)floranthene" into the air and groundwater near the refinery caused them physical injuries, mental distress, and property damage.  (*Id* at 9.).  The *White*, *Justice*, *Daughtry*, *Worsham*, and *Shepard* lawsuits were consolidated by the First Judicial District Court on June 2, 2003.  (*Id*.).

Pennzoil gave timely notice to AISLIC of the *White*, *Justice*, *Daughtry*, and *Worsham* lawsuits, as the Policy required.  (*Id.*, at 7).  AISLIC asserts that Pennzoil did not provide written notice of the *Shepard* suit until November 28, 2007.  (Docket Entry No. 5, at 2).  Pennzoil argues that the claims made by the *Shepard* plaintiffs are so similar to those in the *Daughtry* suit that timely notice of the *Daughtry* action was *de facto* notice of the *Shepard* action.  (Docket Entry No. 20, at 23 n.25).

Between August 28, 2001 and September 5, 2001, AISLIC accepted its duty to defend the *White*, *Justice*, *Daughtry*, and *Worsham* lawsuits, subject to Pennzoil's payment of a "$2 million deductible per incident."  A single deductible "applies to all Clean-Up Costs, or Loss arising from the same, related or continuous Pollution Conditions."  (Docket Entry No. 20, Ex. 3-A).  AISLIC initially took the position that at least three incidents were involved in the underlying lawsuits.  As more information about the pleadings became available, AISCLIC took the position that four incidents, and therefore four deductibles, were involved.  The incidents are the January 18, 2000 fire and explosion alleged in the *White*, *Daughtry*, and *Justice* suits; the November 4, 2001 release alleged in the *White* suit; the continuous, long-term air emissions alleged in the *Worsham*, *Daughtry*, and *Justice* suits; and the long-term groundwater contamination alleged in the *Daughtry* and *Justice*

suits.  Pennzoil contends that the five underlying lawsuits all involve losses arising from "the same, related or continuous Pollution Conditions."  Pennzoil seeks partial summary judgment that only one $2 million deductible applies.  Pennzoil asserts that because it has incurred and spent over $2.4 million in defense costs, which are applied against the deductible, the deductible is satisfied and AISLIC must pay the costs of defense.  AISLIC asserts that it has accepted its duty to defend all the underlying lawsuits except for the *Shepard* case, which it is not obligated to cover because of the lack of timely written notice.  AISLIC asserts that it is not obligated to pay defense costs for any of the other four suits because the $2 million deductible has not been satisfied for each separate pollution condition alleged in the underlying suits.[1]

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party

---

[1]   AISLIC has filed "responses to plaintiffs' summary judgment facts."  (Docket Entry No. 32-2).  Most of the responses are objections to Pennzoil's "characterizations" of language in various documents.  The objections based on the best evidence rule are all overruled.  The objection to paragraph 7 of Brian Carmichael's affidavit is overruled because the affidavit establishes his competence to give the testimony.  The objection to paragraph 7 based on the failure to attach documents is moot because this court's ruling does not include a determination of the amount Pennzoil has paid to defend the underlying lawsuits.

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B. Contract Interpretation

Insurance contracts are subject to the same rules of construction as other contracts. *Ran-Nan Inc. v. General Accident Ins. Co.*, 252 F.3d 738, 739 (5th Cir. 2001). A court's primary concern in construing a contract is to determine the parties' intent. *Harrison v. Great Am. Assurance Co.*, 227 S.W.3d 890, 893 (Tex. App.—Dallas 2007, no pet.). Terms in an insurance

8

contract will be given their ordinary meaning unless the policy shows that the words were meant in a different sense. *Mutual Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979).

### III.  Does AISLIC Have a Duty to Defend Pennzoil in the *Shepard* Suit?

The Policy is a "claims-made and reported" policy. Coverages D, E, and F apply only for "Loss," which includes defense costs, that Pennzoil becomes "legally obligated to pay as a result of Claims first made against [Pennzoil] and reported to [AISLIC] in writing during the Policy Period, or during the Extended Reporting Period if applicable." (Docket Entry No. 20, Ex. 3A). Coverage applies if Pennzoil both receives a claim and gives AISLIC notice of it within the Policy period, which ended on October 1, 2002 (without considering the 60 day extended reporting period). It is undisputed that Pennzoil gave timely notice of the *White*, *Justice*, *Daughtry*, and *Worsham* actions. The *Shepard* action was filed on May 10, 2001. AISLIC asserts that Pennzoil first gave written notice of the *Shepard* suit on November 28, 2007. Pennzoil argues that its failure to give timely notice of the *Shepard* suit does not preclude coverage because it did give notice of the *Daughtry* suit, which was a class action brought on behalf of the same plaintiffs as *Shepard*, all the suits were consolidated in 2003, and the lack of timely notice did not prejudice AISLIC. (Docket Entry No. 20, at 23 n.25).

"Courts traditionally distinguish between two types of insurance policies: 'occurrence' policies and 'claims-made' policies. In the case of an 'occurrence' policy, any notice requirement is subsidiary to the event that triggers coverage. In the case of a 'claims-made' policy, however, notice itself constitutes the event that triggers coverage." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 (5th Cir. 1999). Courts strictly interpret the notice provisions in a "claims-made" policy. *Federal Ins. Co. v. CompUSA, Inc.*, 319 F.3d 746, 753 (5th

9

Cir. 2003).  A notice provision requiring that a claim be reported to the insurer during the policy period or within a specific number of days thereafter "define[s] the scope of coverage by providing a certain date after which an insurer knows it is no longer liable under the policy." *Resolution Trust Corp. v. Ayo*, 31 F.3d 285, 289 (5th Cir. 1994).  "A claims-made policy containing a requirement that claims must be reported to the insurer during a specified period is known as a 'claims-made and reported' policy.  In such a policy, a provision will require not only that a claim be made but also that it be reported to the insurer within the specified time period.  Both reports are 'considered essential to coverage' such that 'an insurer need not demonstrate prejudice to deny coverage when an insured does not give notice within the policy's specified time frame.'" *East Texas Medical Center Regional Healthcare System v. Lexington Ins. Co.*, --- F.3d ----, 2009 WL 1982368, (5th Cir. July 10, 2009).  Allowing coverage beyond that period would grant the insured more coverage than he bargained and paid for and would require the insurer to assume coverage for risks for which it had not bargained.  *See Komatsu v. U.S. Fire Ins. Co.*, 806 S.W.2d 603, 607 (Tex.App.—Ft. Worth 1991, writ denied) (noting that "[e]xtension of the notice period in a claims-made policy constitutes an unbargained for expansion of coverage"); *see also Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 923 (Tex. App.—Ft. Worth 1988, writ denied) (noting that both the insured and insurer negotiate for their respective advantages in a claims-made and reported policy).

Pennzoil's arguments are not supported by the law or the record.  Pennzoil cites *PAJ*, *Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636 (Tex. 2008), for the proposition that AISLIC was not prejudiced by untimely notice of the *Shepard* suit and therefore must provide a defense.  *PAJ* involved an occurrence policy.  The Policy at issue here is a "claims-made and reported" policy. In *PAJ*, the Texas Supreme Court recognized a "critical distinction" between the role of notice in

10

occurrence as opposed to claims-made policies.  In an occurrence policy, timely notice is not an essential part of the bargained-for exchange because "'any notice requirement is subsidiary to the event that triggers coverage.'"  243 S.W.3d at 636 (quoting *Matador Petroleum*, 174 F.3d at 658).  As a result, "an insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay."  *Id.* at 636–37.  By contrast, if notice is untimely, "an insurance company may deny coverage under a 'claims-made' policy without a showing of prejudice."  *Matador Petroleum*, 174 F.3d at 659.

Although the *Shepard* suit was filed during the Policy period, Pennzoil did not provide notice of the suit before the extended reporting period expired.  The fact that Pennzoil gave timely notice of the *Daughtry* case does not meet its obligation to give notice of the *Shepard* case.  The administrative consolidation of the cases does not affect Pennzoil's notice obligation, particularly because the consolidation did not occur until 2003.  AISLIC did not receive timely notice of the *Shepard* suit and need not show prejudice from the delay.  Pennzoil's motion for summary judgment that AISLIC has a duty to defend Pennzoil in the *Shepard* suit is denied.

## IV.   Are the "Pollution Conditions" Related So As to Require A Single Deductible?

Pennzoil argues that AISLIC breached the insurance contract and violated the Texas Insurance Code by not paying defense costs in the underlying suits.  Pennzoil contends that AISLIC has a duty to pay defense costs in excess of Pennzoil's $2 million deductible.  According to Pennzoil, the five underlying lawsuits allege "related" Pollution Conditions, so that a single $2 million deductible applies.  Pennzoil asserts that it has spent more than $2 million in defending these suits and argues that it is entitled to a declaratory judgment that its deductible obligation is satisfied as a matter of law.

Pennzoil contends that the eight-corners rule of contract interpretation applies such that this court must only consider the insurance contract and the allegations of the complaints in the underlying lawsuits in determining whether Pennzoil has satisfied its deductible obligation. AISLIC responds that the eight-corners rule does not apply because the questions of whether Pennzoil gave timely notice and satisfied its deductible obligation are coverage issues independent from the merits of the underlying lawsuits. AISLIC argues that because the eight-corners rule does not apply, this court may consider extrinsic evidence, which raises disputed fact issues that preclude summary judgment.

### A.   Does the "Eight Corners" Rule Apply?

"The eight-corners rule provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from terms of the policy and the pleadings of the third-party claimant. Resort to evidence outside the four corners of these two documents is generally prohibited." *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 306 (Tex. 2006). This approach requires that the court compare only the "four corners" of the pleading with the "four corners" of the policy. *Allstate Ins. Co. v. Disability Servs. of the Sw. Inc.*, 400 F.3d 260, 263 (5th Cir. 2005) (applying Texas law). When the rule applies, the court does not examine the merits of the underlying dispute or evidence extrinsic to the policy and the underlying lawsuit pleadings. Whether the insurer must defend is determined as a matter of law because the court need only examine the policy language and the allegations in the underlying petition to make the decision. *See Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). The court construes the policy language and then examines the factual allegations made in the underlying suit to determine whether those allegations could state a claim covered by

the insured's policy. *Id.* An insurer has no legal obligation to defend a suit if the underlying petition does not allege facts that fit within the scope of coverage. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). All doubts are resolved in favor of the duty to defend. *Id.*

In *GuideOne*, the Texas Supreme Court acknowledged that some courts applying Texas law have recognized a limited exception to the eight-corners rule. 197 S.W.3d at 308. This exception permits the use of extrinsic evidence "only when relevant to an independent and discrete coverage issue, not touching on the merits of the underlying third-party claim." *Id.* (citing *Western Heritage Ins. Co. v. River Entm't,* 998 F.2d 311, 313 (5th Cir.1993); *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F.Supp.2d 601, 621–22 (E.D. Tex. 2003); *State Farm Fire & Cas. Co. v. Wade* 827 S.W.2d 448, 451–52 (Tex. App.—Corpus Christi 1992, writ denied); *Gonzales v. Am. States Ins. Co.*, 628 S.W.2d 184, 187 (Tex. App.—Corpus Christi 1982, no writ); *Cook v. Ohio Cas. Ins. Co.*, 418 S.W.2d 712, 715-16 (Tex. Civ. App.—Texarkana 1967, no writ); *Int'l Serv. Ins. Co. v. Boll*, 392 S.W.2d 158, 161 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.)). The court in *GuideOne* did not rule on the validity of that narrow exception because the insurer relied on evidence that was relevant to both coverage and the merits of the underlying suit. *Id.* at 309–10 ("GuideOne relies on extrinsic evidence that is relevant both to coverage and the merits and thus does not fit the above exception to the rule . . . . Those courts that have recognized an exception to the eight-corners rule have done so under limited circumstances involving pure coverage questions."). The *GuideOne* court did note the Fifth Circuit's opinion in *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523 (5th Cir. 2004), in which the Fifth Circuit had opined that, were any exception to be recognized by the Texas Supreme Court, it would likely be narrow, applicable only "when it is initially impossible to discern whether coverage is potentially implicated

13

and when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." *Id.* at 308–09.  "Fundamental coverage issues have been defined to include: (1) whether the person sued has been specifically excluded by name or description from any coverage, (2) whether the property in suit is included in or has been expressly excluded from any coverage, and (3) whether the policy exists."  *Northfield Ins. Co.*, 363 F.3d at 530.

The Texas Supreme Court has considered this narrow exception since deciding *GuideOne*, but has declined to recognize the exception because the cases did not qualify.  *See Pine Oak Builders, Inc. v. Great American Lloyds Ins. Co.*, 279 S.W.3d 650, 653 (Tex. Feb 13, 2009); *Zurich American Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. Aug 29, 2008); *see also D.R. Horton--Texas, Ltd. v. Markel Intern. Ins.*, 2006 WL 3040756, at *5 n.11 (Tex. App.—Houston [14 Dist.] 2006) ("To the extent that [*GuideOne*] indicates that the authoring court would recognize an exception to the eight corners rule to consider evidence related solely to coverage, such language is mere dicta.").  The Fifth Circuit recently noted that "Texas has yet to adopt such an exception" to the eight-corners rule.  *See Mary Kay Holding Corp. v. F.D.I.C.*, 309 Fed. App'x 843, 848 (5th Cir. 2009).

In the absence of a final decision by the Texas Supreme Court on an issue, a federal court sitting in diversity is ordinarily required to make an "*Erie* guess" as to what the decision would be. *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007).  Such a guess, however, is not necessary in this case.  The amount of Pennzoil's deductible obligation is an "independent and discrete coverage issue[s], not touching on the merits of the underlying third-party claim[s]."  *See GuideOne*, 197 S.W.3d at 308.  But the narrow exception to the eight-corners rule

14

recognized by several courts also requires that it be "initially impossible to discern whether coverage is potentially implicated" before extrinsic evidence may be considered. *See Northfield Ins. Co.*, 363 F.3d at 530. This element refers to situations in which the complaint either omitted or misrepresented material facts that would clearly exclude coverage. *See*, *e.g.*, *Western Heritage Ins. Co.*, 998 F.2d at 313 (noting that the complaint specifically omitted the fact that the third-party tortfeasor had been intoxicated when he left the insured's establishment in an obvious attempt to evade the clear policy exclusions); *Wade*, 827 S.W.2d at 451 (in the absence of any allegation about how the boat that was the subject of the policy was used, the court could not determine, even "by reading the underlying petition broadly . . . whether or not the personal boatowner's liability policy even possibly provides coverage"); *Boll*, 392 S.W.2d at 161 (when the policy contained an exclusion for "any claim arising from an accident while the insured vehicle was being driven by Roy Hamilton Boll," but did not disclose that Roy Hamilton Boll was the insured's son, and the petition alleged only that the car was being driven by the insured's "son," the insurer was permitted to introduce extrinsic evidence to show that the insured only had one son and that his name was Roy Hamilton Boll).

The complaints in the underlying lawsuits allege that Pennzoil is liable for personal injuries and property damage sustained as a result of pollution, which is clearly covered under this Pollution Legal Liability Policy. It is not impossible to tell whether the underlying lawsuits potentially implicate coverage. To the contrary, AISLIC acknowledges that it has a duty to defend the timely noticed lawsuits under the Policy; the only issue is whether one or more deductibles applies. That issue in turn depends on whether the losses allegedly arising from the Pollution Conditions are "the "same, related or continuous." It is unnecessary to determine whether the Texas Supreme Court

15

would adopt the narrow exception to the eight-corners rule recognized in *GuideOne* because the exception would not apply here.   AISLIC's duty to defend will be determined based on the allegations in the underlying suits and on the Policy terms.

**B.    Does the Alleged Liability Arise from Related Pollution Conditions**?

In determining whether Pennzoil has satisfied its deductible, the issue is whether the pollution conditions alleged in the four underlying lawsuits are "the same, related or continuous Pollution Conditions."  If the Pollution Conditions are "the same, related or continuous," then one deductible applies to the defense of all the underlying suits.  If they are not, Pennzoil must pay a separate $2 million deductible for the alleged unrelated Pollution Conditions.

"Pollution Conditions" are defined as the "discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical wastes and waste materials into or upon land, or any structure on land, the atmosphere, or any watercourse or body of water, including groundwater . . . ."  (Docket Entry No. 20, Ex. 3-A).  The parties agree that the Pollution Conditions alleged in the underlying lawsuits are not "the same" or "continuous."  The Policy does not define  "related."

When a term in an insurance policy is not defined, courts use the ordinary and generally accepted meaning.  *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990).  Pennzoil cites *N. Am Speciality Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552 (5th Cir. 2008) and *Columbia Cas. Co. v. CP Nat'l Inc.*, 175 S.W.3d 339 (Tex. App.—Houston [1st Dist.] 2004, no pet.), in arguing that "related" is properly defined as "having a logical or causal connection."

According to Pennzoil, the Pollution Conditions alleged in the underlying lawsuits have a logical or causal connection because they "focus on the alleged release of pollutants over time from

Pennzoil's refinery in Shreveport, Louisiana into the surrounding air and groundwater." (Docket Entry No. 20, at 17). Pennzoil argues that all the releases alleged in the underlying lawsuits originated from the same refinery, affected the same group of people (nearby residents), contained benzene, caused exposure to airborne or waterborne contaminants, and were all caused by Pennzoil's failure to "inspect, test, maintain, and repair" its equipment or to "properly train [its] employees." (*Id.* at 21).

AISLIC argues that there are four unrelated Pollution Conditions alleged in the underlying lawsuits: the January 18, 2000 fire and explosion in the Naptha Unifiner Unit that resulted in the release of various pollutants; the November 4, 2001 release of pollutants; long-term continuous releases of pollutants; and long-term, continuous contamination of subsurface water. AISLIC points out that the *White* and *Daughtry* suits are filed by the same named plaintiffs but do not assert the same claims. These suits separately allege injury and damage arising from the January 18, 2000 fire and explosion (at issue in *White* and *Daughtry*); the November 4, 2001 release (at issue in *White* only); the claims for long-term exposure to toxic air emissions (at issue in *Daughtry* only); and claims based on groundwater contamination (at issue in *Daughtry* only). The *Worsham* suit does not involve the January 18, 2000 fire or the November 4, 2001 release, but only alleges damages as a result of long-term exposure to toxic air emissions from the refinery. AISLIC argues that the allegation in the underlying suits that the damages were caused by Pennzoil's failure to inspect, test, maintain, and repair its refinery equipment is a legal theory and cannot serve as the basis for concluding that the Pollution Conditions are "related."

In moving for summary judgment, Pennzoil cited and relied on Texas law. AISLIC argues that because the underlying lawsuits were brought by Louisiana residents for harm that occurred in

Louisiana, it is necessary to determine which law applies.  The Policy, which provides coverage for numerous insured risks nationwide, does not contain a choice-of-law provision.  (Docket Entry No. 20, Ex. 3-A) (insuring properties located in Texas, Utah, Indiana, Pennsylvania, West Virginia, Mississippi, California, Missouri, Ohio, New York, New Jersey, Kansas, Maryland, Illinois, Oregon, and Louisiana).

A federal court applies the choice-of-law rules of the forum in which it sits.  *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).  Texas courts use the "most significant relationship" test to decide choice-of-law issues in a contract action if the parties did not designate a choice of law.  *See Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 233 (Tex. 2008).  The test is based on factors outlined in the *Restatement (Second) of Conflicts*.[2]  Section 188 of the *Restatement* sets out the factors to be considered in a contract claim, including (a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-36 (Tex. 1997); *Restatement (Second) Conflict of Laws* § 188(2).

AISLIC argues that Louisiana law applies because that is where the refinery and the underlying-suit plaintiffs are located.  In a suit asking the court to determine whether an insurer has a duty to defend or indemnify, in which the issues "require the construction and application of

---

[2]   Section 6 of the *Restatement* sets forth general choice-of-law principles, under which courts consider (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied.  *See Restatement (Second) of Conflict of Laws* § 6(2) (1971).

insurance policies, . . . the relevant inquiry is what contacts the state has with the insurance dispute, and not with the underlying lawsuit." *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996). When, as here, the insurance policy covers risks located in many states, the location of the underlying suits and of the specific insured risk that is the subject of those suits are not determinative. *See Restatement (Second) Conflict of Laws* § 193, cmt. a ("The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this cannot be done . . . include . . . where the policy covers a group of risks that are scattered throughout two or more states."); *see also Houston Cas. Co. v. Certain Underwriters at Lloyd's London*, 51 F.Supp.2d 789, 797 (S.D. Tex. 1999) ( "HCC's obligation under the parties' agreement was to pay a premium; the Underwriters' obligation was to indemnify certain losses. Where the losses occurred did not affect either obligation. When the contract is one of payment, the place of performance seems, in truth, of no particular consequence."). In this case, which involves a policy that insures risks located in different states and the insured asserts that the insurer has breached its duty to defend, the places of contracting and negotiation, and the parties' domicile, residence, nationality, place of incorporation, and place of business are the primary factors to consider.

Pennzoil is a Delaware corporation with its principal place of business in Houston, Texas. AISLIC is an Illinois corporation with its principal place of business in New York. The Policy was issued from AISLIC through a Texas broker to Pennzoil at its principal place of business in Texas. Texas appears to have the most significant relationship with the parties and their dispute. Texas has a strong interest in the outcome of an insurance coverage dispute involving an insurer doing business in Texas with an insured whose principal place of business is in Texas. Louisiana has little interest

19

in whether AISLIC defends Pennzoil in the underlying lawsuits based on a pollution legal liability policy issued in Texas.  The choice-of-law analysis points to the application of Texas law.

The issue in this case is whether the pollution conditions alleged in the five underlying lawsuits are "the same, related or continuous Pollution Conditions," resulting in a single deductible. The parties did not cite, and this court did not find, cases analyzing this issue in pollution legal liability policies, perhaps because such policies are relatively new forms of coverage.[3]

The courts have taken three basic approaches to determining whether one or more "occurrences" caused the loss when that affects the amount of coverage or the number of deductibles to be applied.  These are the "cause" test, the "unfortunate events" test, and the "effects" test.  The majority approach is represented by the "cause" test.  Under this test, the issue is resolved by reference to the underlying cause or causes of the injury or damage, rather than by reference to the number of resulting injuries or damage claims.  Texas courts follow this approach, although the precise question may differ to some extent depending on whether the policy involved is a loss policy or a liability policy.  As to the former, Texas courts examine the number of loss occurrences based on the number of events that caused the loss or losses at issue.  As to the latter, Texas courts look to "events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects."  *See U.E. Tex. One-Barrington, Ltd. v. Gen. Star Indem. Co.*, 332 F.3d 274, 278 (5th Cir. 2003); *Ran-Nan, Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir. 2001); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 534 (5th Cir. 1998); *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 682 (Tex. App.-Houston [14th Dist.] 2006, pet. denied).  The

---

[3]    Pollution legal liability policies and environmental insurance policies were designed to fill gaps in insurance coverage created by pollution exclusions that appear in most forms of property and liability insurance contracts.  *See*  Ann M. Waeger, *Current Insurance Policies for Insuring Against Environmental Risks*, SP033 A.L.I.-A.B.A. 1209 (2008).

courts do not look to an "overarching cause," but rather focus on the event that gives rise to the insurer's liability under the policy.[4]

In *U.E. Tex. One-Barrington*, an insured apartment complex had plumbing leaks in nineteen of its buildings, causing foundation movement and above-ground damage.  332 F.3d at 278.  The policy required the insured to pay a $1,000,000 deductible per "loss occurrence," which was defined as "the total loss by perils insured against arising out of a single event."  *Id.*  The damage to any one building did not exceed $1,000,000.  The insurer argued that each building leak was a single occurrence subject to a separate deductible.  The insured argued that faulty pipe materials and installation caused all the leaks, resulting in a single occurrence and a single deductible.  The Fifth Circuit held that because a different leak was responsible for the damage to each building, each leak was a separate occurrence as a matter of law.  The court cited a Texas court of appeals case, *Goose Creek Consolidated Independent School District v. Continental Casualty Co.*, 658 S.W.2d 338 (Tex. App.—Houston [1st Dist.] 1983, no writ), to conclude that the proper focus is not "on the alleged

---

[4]    Louisiana courts follow the "effects" test, focusing on  the effects of the event giving rise to liability to determine whether one or multiple occurrences caused the loss when that affects the amount of coverage. *See, e.g.*, *Lombard v. Sewerage & Water Board of New Orleans*, 284 So.2d 905, 915-16 (La.1973) (holding that if different parties are damaged by a series of events, the damage to each party is a separate "occurrence" for purposes of an insurance contract); *Tesvich v. 3-A's Towing Co.*, 547 So.2d 1106, 1111 (La. Ct. App. 1989) ("[W]e have concluded on the basis of *Lombard* that the claim of each plaintiff with respect to his or her leases constitutes a separate occurrence.") (citation omitted); *Whetstone v. Dixon*, 616 So.2d 764, 773 (La.App. 1st Cir.1993) (finding that the injuries of one person and the death of another that occurred in one auto accident were one "occurrence" where policy defined "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions"); *Miley v. Continental Ins. Co.*, 645 So.2d 1166, 1168 (La. App. 1994) ("any resulting damage occasioned by the continuous or repeated exposure to the condition would substantiate the finding of an occurrence"); *Reynolds v. Transcontinental Ins. Co.*, 1995 WL 16795 (E.D. La. Jan. 17, 1995) (finding a separate occurrence for each individual injured or killed by carbon monoxide poisoning that was caused by the insured contractor's negligence in installing a used vented heater).  The result in this case would not appear to differ if Louisiana law applied.  Because the petitions in the underlying suits allege a number of different effects resulting from the releases of chemicals from the refinery — toxic air emissions, groundwater contamination, and various  resulting physical injuries and property damages — the Pollution Conditions appear to be unrelated under Louisiana law.

overarching cause," – the faulty installation and materials – but rather on the "specific event that caused the loss" – the separate leaks that caused the damage in each building.  *U.E. Tex. One-Barrington*, 332 F.3d at 278.  In *Goose Creek,* a single arsonist had started two separate fires at two separate places and two separate times.  The policy in that case stated that a "loss occurrence" referred to the "total loss by perils insured against arising out of a single event."  658 S.W.2d at 340.  The *Goose Creek* court rejected the insured's argument that the damages arose from a single occurrence with a single deductible, concluding that "where there are two fires at two different places with two separate causal factors, there are two loss occurrences."  *Id.* at 341.

The courts in *U.E. Tex. One-Barrington* and *Goose Creek* analyzed loss policies that defined "occurrence" as "the total loss by perils insured against arising out of a single event."  The Policy in this case is a liability policy, not a loss policy.  "Definitions of 'occurrence' under liability policies tend to be similar to each other and dissimilar to the definitions of 'loss occurrence' under loss policies. These variances in the meanings of key terms may advise different outcomes to otherwise similar cases." *U.E. Tex-One Barrington*, 332 F.3d at 280 n.2 (Smith, J., dissenting).  The Policy in this case states that "[t]he Deductible amount applies to all Clean-Up Costs, or Loss arising from the same, related or continuous Pollution Conditions."  (Docket Entry No. 20, Ex. 3-A).  Because of the different policy types and terms, the decisions in *U.E. Tex. One-Barrington* and *Goose Creek*, while offering helpful guidance, are not dispositive in determining whether the Pollution Conditions alleged in the underlying lawsuits are "related."

Cases involving liability policies that define "occurrence" to include "continuous or repeated exposure to substantially the same conditions" or "related conditions" are helpful.  In *Lennar Corp. v. Great American Ins. Co.*, 200 S.W.3d 651 (Tex. App.—Houston [14th Dist.] 2006, pet. denied),

an insured homebuilder used a defective synthetic stucco product on over 400 homes and was required to remove and replace it with traditional stucco. The synthetic stucco trapped water behind it and did not allow drainage, causing wood rot and mold. The homebuilder sought indemnification for the replacement and repair costs under its general liability policy, which included a $250,000 deductible per "occurrence." The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 663. The homebuilder argued that there was only one "occurrence" because there was only one cause of damage to the homes — the defect in the synthetic stucco that caused "repeated and continuous entrapment of water." *Id.* at 682. The court rejected this argument, concluding that the homebuilder's liability to a homeowner "stemmed from the application of [the synthetic stucco], and the resulting damage, if any, to his or her particular home." *Id.* The court reasoned that there was not one single entrapment of water that caused damage. Instead, the synthetic stucco's entrapment of water on a particular home "caused damage to that home only." *Id.* at 683. Because the homebuilder was exposed to a new and separate liability for each home," the claim for replacement costs for each home was a separate "occurrence." *Id.*; *see also Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co* ., 447 F.2d 204, 205-06 (5th Cir. 1971) (finding eight separate occurrences under a liability policy when the company distributed, but did not itself contaminate, contaminated bird seed to eight distributors in eight sales).

When there is more than one immediate cause of events giving rise to an insured's liability in an underlying lawsuit, courts have rejected the argument that there is a single "occurrence" based on continuous "exposure" to the insured's alleged negligence. In *H.E. Butt Grocery Co.*, the court addressed whether two instances of sexual abuse by an employee constituted one "occurrence" for

purposes of a coverage threshold in a liability policy.  In that case, an HEB employee sexually assaulted two different children one week apart in an HEB store.  150 F.3d at 528.  HEB had a comprehensive general liability insurance policy under which it was required to pay a "self-insured retention ("SIR") limit of $1,000,000 per 'occurrence' as that term [was] defined in the policy."  *Id.* The policy used a typical definition of "occurrence," as follows:

> "Occurrence" means an event, including continuous or repeated exposure to conditions, which result[s] in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint of the Insured.  All Personal Injury or Property Damage arising out of the continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* at 529.  After HEB was sued, it sought a declaratory judgment against its insurer that each sexual abuse instance arose from the same "occurrence," which it characterized as HEB's negligence in supervising its employee.  *Id.*  The insurer argued that each sexual abuse incident was a separate "occurrence" under the policy.  *Id.*  The court concluded that "the two independent acts of sexual abuse 'caused' the two children's injuries and gave rise to HEB's separate and distinct liability in each case."  *Id.* at 531.  Without the sexual abuse, there would have been no injury and no basis for a negligence lawsuit against HEB.  The two instances did not arise "out of the continuous or repeated exposure to substantially the same general conditions" because "each child was 'exposed' to the pedophilic employee, not to HEB's negligent employment practices."  *Id.* at 533.  Because each child's injury was independent and was caused by a separate act of sexual abuse, HEB had to satisfy the $1,000,000 SIR for each lawsuit.  *Id.* at 534.

In *Esparza v. Eagle Express Lines, Inc.*, 2007 WL 969585, at *10 (E.D. Tex. Mar. 28, 2007), the court applied a similar approach in a very different context.  The liability policy in that case

provided a coverage limit per "accident" and stated that "[a]ll 'bodily injury', 'property damage' and 'covered pollution cost or expense' resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one 'accident.'" *Id.* at *8. The court had to determine whether one accident or two accidents occurred when a tractor-trailer heading north crossed the median and collided with two vehicles heading south. One of those vehicles was in the right lane and the other was in the left lane. The insurer argued that one "accident" had occurred because the two vehicles that were hit were "exposed to continuous or repeated exposure to the same condition, that is, [the tractor-trailer] crossing the median into the southbound lanes." *Id.* at *10. The court rejected this argument, reasoning that each collision occurred independently because they were (albeit minimally) separated by time and distance, and there was no evidence that the first collision had caused the second. *Id.* The court held that "it was each collision in the instant case that created the continuous or repeated exposure to the same, or substantially the same, conditions, not the fact that the tractor-trailer crossed the median." *Id.*

Applying the principles from these cases leads to the conclusion that Pennzoil is not entitled to summary judgment that it has satisfied the deductible obligation under the Policy. The Policy language is clear and unambiguous. The $2 million deductible applies to losses or costs arising from "the same, related, or continuous" Pollution Conditions. "Pollution Condition" is defined as the "discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant." (Docket Entry No. 20, Ex. 3-A). Because "related" is undefined in the Policy, its ordinary meaning – having a logical or causal connection – applies. *See North American Specialty Ins. Co. v. Royal Surplus Lines Co.*, 541 F.3d 552, 557 (5th Cir. 2008) (noting that the word "related" in an insurance policy means that a "series of multiple incidents [is] a single continuing

incident or occurrence" only if they are "related" and adopting the definition of "having a logical or causal connection").

The petitions in the underlying suits allege distinct kinds of emissions and releases, with distinct causes. One is the pollutants released as a result of the January 18, 2000 fire and explosion in a specific unit of the refinery, allegedly due to a corroded heat exchanger in that unit. A second is a discrete release of pollutants that allegedly occurred on November 4, 2001, almost two years later. The first involved an explosion and fire; the other did not. The petitions also allege that releases of different types of contaminants into two distinct areas – air and subsurface water – have occurred continuously for years.

Pennzoil's arguments for viewing all of the pollution releases and emissions alleged in the underlying suits as a single related "Pollution Condition" are unsupported by the pleadings in the underlying cases and by the applicable law. Pennzoil asserts that each of the underlying suits alleges benzene as a contaminant, but the petition in the *White* lawsuit does not allege that benzene was involved in the November 4, 2001 release. (Docket Entry No. 21, Ex. 2C). The petition in the *Daughtry* action alleges that groundwater has been contaminated with benzanthracene, benzopyrene, bis(2-Ethlyhexly)phthalate, benzo(b)floranthene, benzo(k)floranthene, and chyrsene but does not allege benzene contamination. (*Id.*, Ex. 2D). Pennzoil asserts that all of the suits allege the same cause of all the pollution releases and emissions: Pennzoil's failure properly to train its employees and maintain its equipment. But the cases teach that in determining whether there are multiple liability-triggering events and therefore more than one deductible, the court is not to look to an "overarching cause," but rather to the specific events that allegedly give rise to the insured's liability to nonparties. So, for example, in *H.E. Butt*, the court held that the separate acts of abuse that gave

rise to the claims against HEB were separate occurrences, rejecting the argument that the negligent supervision of the pedophilic employee caused the injury and was a single occurrence. In *Pincoffs,* the court held that the separate sales of contaminated seed that gave rise to the claims against the wholesaler were each "occurrences," rejecting the argument that the event that caused the contamination was the only "occurrence." In *U.E. Texas One-Barrington, Ltd.,* although it involved a loss policy, the court held that the approach was the same as under a liability policy and rejected the argument that the allegedly faulty pipe installation causing nineteen leaks in nineteen buildings was a single occurrence. Instead, the court held that each leak was responsible for the damage to each building and constituted a separate occurrence with a separate deductible. And in *Lennar*, the court held that the separate application of defective stucco to each home resulted in the insured's separate liability, rejecting the argument that the common defect in the stucco was a single "occurrence."

In determining whether an insurer has a duty to defend, "the court must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged." *Mid-Century Ins. Co. of Texas v. Lindsey*, 997 S.W.2d 153, 164 (Tex. 1999). In the present case, the liability-triggering event is not simply Pennzoil's failure to train its employees properly or to maintain its equipment sufficiently. Instead, three of the four underlying lawsuits allege a specific discrete event, the January 2000 explosion and fire from the heat exchanger in the Naptha Unifiner Unit that resulted in the release of smoke and toxic substances into the air. One of the suits alleges a separate specific discrete event, the November 2001 release of hazardous substances. Three of the cases allege continuous, long-term air emissions. And two of the cases allege long-term

groundwater contamination.  The allegations in the underlying lawsuits do not show one related Pollution Condition.

Pennzoil's reliance on *North American Speciality Ins. Co.* and *Columbia Cas. Co.* is misplaced.  In *North American Speciality Ins. Co.*, the issue was whether the liability arising from a suit against a nursing home involved a single covered event or multiple discrete events.  The policy stated that "all related 'medical incidents' arising out of the providing of or failure to provide professional health care services to any one person shall be considered one 'medical incident.'"  541 F.3d at 558.  The court noted that the plaintiff in the underlying suit against the insured nursing home alleged a "pattern and practice of ongoing neglect," not a series of discrete events.  Because there was no evidence of discrete unrelated injuries leading to discrete individualized damages, the acts giving rise to liability in the underlying suit were "related" and constituted one medical incident. *Id.*  Similarly, the court in *Columbia Cas. Co.* held that malpractice claims against two doctors for misdiagnosing the same patient were "related" under the policy because all the alleged acts of malpractice involved "the same patient, at the same facility, during the same period of time, with regard to the same x-ray," all resulting in delayed diagnosis and injury.  By contrast, the facts alleged in the underlying suits in this case involve two discrete events – releases from the January 2000 fire and explosion in the heat exchanger in the Naptha Unifiner Unit and a November 2001 release – and long-term continuous releases of two different kinds of pollutants – air pollutants and groundwater contaminants.

The conclusion that there is not a single set of related Pollution Conditions is supported by the result in *Royal Ins. Co. of Am. v. Caliber One Indemnity Co.*, 465 F.3d 614, 622 (5th Cir. 2006).  In that case, the issue was whether the underlying suit against a nursing home involved one or more

occurrences under the policy's terms.  The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *Id.* at 623. The plaintiff in the underlying suit alleged that the nursing home was negligent by "fail[ing] to take adequate measures to guard against" the patient's health problems.  The court noted the expert testimony that nursing home employees were "negligent at different times" and "that this negligence caused discrete . . . injuries."  *Id.*  The court held that "the numerous independent grounds of negligence" alleged "cannot be unified as 'repeat exposure to substantially the same conditions.'" *Id.* at 624.  In the present case, while this court does not conclude how many Pollution Conditions occurred, it cannot conclude as a matter of law that there was a single related Pollution Condition requiring only one deductible.

Pennzoil argues that this court should interpret the Policy by applying the presumption in favor of coverage.  This presumption, however, does not apply to the Policy because it is unambiguous.  *See Six Flags*, *Inc. v. Westchester Surplus Lines Ins.*, 565 F.3d 948, 957 (5th Cir. 2009) (concluding that rule of strict construction of insurance policy only applies after a policy is found to be ambiguous); *Sharp v. Fed. Sav. & Loan Ins. Corp.*, 858 F.2d 1042, 1046 (5th Cir. 1988) ("[W]e have already demonstrated that this contract is not ambiguous, and therefore even giving the contract a strict construction we would reach the same result."); *Calcasieu-Marine Nat'l Bank of Lake Charles v. Am. Employers' Ins. Co.*, 533 F.2d 290, 296 (5th Cir. 1976) ("The special rules of interpretation do indeed apply only when there is an ambiguity; . . . [t]his is so even when the result is an apparently harsh consequence to the insured.").

Pennzoil's motion for summary judgment that it has satisfied its deductible obligation is denied.  Because an insurer is liable for a violation of Chapter 542 of the Texas Insurance Code if

29

it has a duty to defend a covered lawsuit and it fails to do so, and because there has been no finding

that Pennzoil has satisfied its deductible, Pennzoil is not entitled to summary judgment that AISLIC

violated the Texas Insurance Code.  *See Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 936

(N.D. Tex. 2009) (an insurer was not liable for breach of Chapter 542 of Texas Insurance Code

because the underlying lawsuits were not covered under the policy).

## V.     Conclusion

Pennzoil's motion for partial summary judgment is denied.

SIGNED on September 4, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge